UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Robert Kirsch |
| v. | : | Crim. No. 24-CR-496 |
| CHAIM ELIMELECH PURETZ, a/k/a "ELI PURETZ" | : | 18 U.S.C. § 371 |
| | : | 18 U.S.C. § 1343 |

RECEIVED
AUG - 1 2024
AT 8:30_____M
CLERK, U.S. DISTRICT COURT - DNJ

### INFORMATION

The defendant having waived in open court prosecution by Indictment, the United States charges:

(Conspiracy to Commit Wire Fraud Affecting a Financial Institution)

### Background and Relevant Parties

1. At all times relevant to this Information:

   a. The defendant, Chaim Puretz, a/k/a "Eli Puretz," was a resident of Jackson, New Jersey.

   b. Troy Technology Park was a commercial office complex in Troy, Michigan. Troy Technology Park was owned by Troy Technology Holdings LLC. Defendant Puretz was a member of Troy Technology Holdings LLC.

   c. "Financial Institution 1" was a financial institution as defined by 18 U.S.C. § 20, with headquarters in New York, New York. Financial Institution 1 issued a mortgage loan for the purchase of Troy Technology Park.

   d. Riverside Abstract ("Riverside") was a title company with offices in Lakewood, New Jersey.

  e. Apex Equity Group ("Apex") was a privately held real estate investment and advisory firm that was based in Newark, New Jersey.

  f. "Co-Conspirator 1" was an employee of Apex, the father of defendant Puretz, and an owner of Troy Technology Park

  g. Boruch "Barry" Drillman was the managing member of Troy Technology Holdings LLC and an owner of Troy Technology Park.

  h. Individual 1 was the founder and CEO of Aandar Real Estate Capital, which was based in Rochelle Park, New Jersey.

  i. An "arm's length" transaction was one where the buyer of a property did not have a preexisting familial or business relationship with the seller.

  j. A Purchase and Sale Agreement ("PSA") was a document that was written and signed after a buyer and seller mutually agreed on the price and terms of a real estate transaction.

  k. A Letter of Intent ("LOI") was a document that outlined the terms of a potential sale of a property and served as an "agreement to agree" between two parties.

### Commercial Property Mortgage Lending Process

2. When a real estate developer or "sponsor" identified a commercial property they were interested in purchasing, the sponsor or their broker typically reached out to the current owner and sent an LOI outlining their interest in the property, potential sales price, and sponsor due diligence. If the current owner (*i.e.*, the seller) agreed to the terms, the sponsor and seller entered into a PSA outlining in greater detail the specifics of the sale transaction.

3. Around the same time of the LOI or PSA, the sponsor typically sought financing for the transaction. Financing a commercial property generally involved loans with seven- to ten-year terms, with balloon payments at the end of the term. At the expiration of a term, when the balloon payment was due, borrowers often re-financed the loan to satisfy the balloon payment and any other outstanding debts. Lenders generally loaned up to approximately eighty percent of the value of the property. Lenders typically required a borrower to fund the remaining twenty percent equity requirement with cash, so the sponsor had a financial stake in the property's future value and performance.

4. Financial institutions that were considering issuing a loan on a commercial property evaluated several factors to determine whether to make the loan, including, among other considerations, the value of the property. To determine the value of the property, the lender typically hired an appraiser.

5. Appraisers assumed the PSA was an arm's length transaction, and typically an appraiser valued the property at or close to the purchase amount in the PSA.

### The Conspiracy

6. From at least as early as in or about 2020, through in or about 2022, in the District of New Jersey, and elsewhere, the defendant

CHAIM ELIMELECH PURETZ,
a/k/a "ELI PURETZ,"

did knowingly and willfully conspire and agree with others to commit an offense against the United States, namely, wire fraud affecting a financial institution, that is, to knowingly, and with the intent to defraud, having devised and intending to

3

devise a scheme and artifice to defraud Financial Institution 1, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing such pretenses, representations, and promises were false and fraudulent when made, and, for the purpose of executing such scheme and artifice to defraud, did transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds affecting one or more financial institutions, contrary to Title 18, United States Code, Section 1343.

### Objects of the Conspiracy

7. It was an object of the conspiracy to induce Financial Institution 1 to issue a commercial mortgage loan to Troy Technology Holdings LLC, an entity co-owned by defendant Puretz, based on false pretenses, representations, and promises regarding the inflated value of the commercial property.

8. It was further an object of the conspiracy to obtain a loan on Troy Technology Park in an amount greater than Troy Technology Holdings LLC would have qualified for and to enrich defendant Puretz, and his co-conspirators, with the inflated loan proceeds generated by the fraudulently obtained loan.

9. It was further an object of the conspiracy for defendant Puretz and co-conspirators to obtain millions of dollars of victims' funds through false and misleading statements and material omissions regarding the purchase prices of Troy Technology Park and another real estate investment.

## Manner and Means of the Conspiracy

10. It was a part of the conspiracy that conspirators engaged in a "flip" transaction, in which they used a related party to serve as a straw buyer in order to purchase Troy Technology Park for approximately $42,700,000 before selling or flipping the property to Barry Drillman for approximately $70,000,000. The $70,000,000 purchase price was falsely presented to Financial Institution 1 as the price negotiated to purchase the property at arm's length. The purchase price was a key input used by Financial Institution 1 to determine the market value of the property. Members of the conspiracy purposely misled and concealed from Financial Institution 1 the true sales price of approximately $42,700,000.

11. It was further a part of the conspiracy that, based on the conspirators' false statements to Financial Institution 1, on or about September 25, 2020, Financial Institution 1 issued a loan to Troy Technology Holdings LLC, which was co-owned by defendant Puretz, in the amount of approximately $45,000,000 for the purchase of Troy Technology Park. The conspirators further misrepresented to Financial Institution 1 that this loan amount was approximately 65% of the $70,000,000 purchase price.

## Overt Acts in Furtherance of the Conspiracy

12. In furtherance of the conspiracy, at least one of the co-conspirators committed at least one of the following overt acts, among others, in the District of New Jersey and elsewhere:

13. Beginning in 2020 until 2022, defendant Puretz solicited prospective investors to entrust him and Apex with approximately $3,550,000 for investment in

5

real estate transactions, including Troy Technology Park. The funds were not invested in accordance with the solicitations.

14. On or about February 25, 2020, defendant Puretz sent an email to an employee of the seller of Troy Technology Park, with an attached LOI from Apex dated on or about February 17, 2020, with an offer to purchase Troy Technology Park for approximately $42,000,000. The letter was signed by Co-Conspirator 1 as a Managing Member of Apex.

15. On or about June 11, 2020, Individual 1 sent an email to an Executive Director at Financial Institution 1 seeking a loan for Troy Technology Park. In this email, Individual 1 stated that Barry Drillman was the sponsor who was purchasing the property for approximately $65,000,000 and seeking a loan of approximately $48,750,000.

16. On or about July 10, 2020, the owner of Troy Technology Park entered into an agreement with defendant Puretz to sell the property for approximately $45,200,000.

17. On or about September 14, 2020, Individual 1, to justify the $70,000,000 purchase price, sent an email and attachment to Financial Institution 1. The attached file was an LOI to purchase Troy Technology Park for $68,800,000. This LOI was sent, in turn, to the appraiser by Financial Institution 1.

18. On or about September 25, 2020, the sale of Troy Technology Park was completed. The morning of closing, defendant Puretz sent Individual 1 two closing statements—one for the actual sales price ($42,700,000), and the other for the false, inflated sales price ($70,000,000)—in order to conceal the actual Troy Technology

Park closing price from Financial Institution 1. Riverside utilized the closing statements and performed two closings on the property, one for the seller with a contract price of $42,700,000, and one for the lender with a contract price of $70,000,000.

19.  Furthermore, members of the conspiracy provided a short term one-week loan of approximately $30,000,000 to support the closing for the inflated sales price.

In violation of Title 18, United States Code, Section 371.

## FORFEITURE ALLEGATION

1.      The allegations contained in this Information are realleged here for the purpose of noticing forfeiture pursuant to Title 18, United States Code, Section 982(a)(2)(A).

2.      The United States gives notice to defendant Puretz that, upon conviction of the offense charged in this Information, the United States will seek forfeiture, in accordance with Title 18, United States Code, Sections 982(a)(2)(A), of any and all property, real and personal, that constitutes or was derived, directly and indirectly, from proceeds obtained as the result of the offense, including, but not limited to, the sum of United States currency to be determined by the court to be evidenced by a monetary judgment issued by this Court in aforesaid amount. Said judgment will accrue at the prevailing rate per annum and serve as a judgment and lien against the defendant's property, wherever situated until fully satisfied.

3.      If by any act or omission of defendant Puretz, any of the property subject to forfeiture described above:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1),

to seek forfeiture of any other property of defendant Puretz up to the value of the above-described forfeitable property.

GLENN S. LEON
Chief, Fraud Section
Criminal Division
U.S. Department of Justice

*Siji Moore*
Siji Moore
Trial Attorney, Fraud Section
Babasijibomi.Moore2@usdoj.gov
1400 New York Ave, N.W.
Washington, D.C. 20005
Tel: 202-834-2793

PHILIP R. SELLINGER
United States Attorney

CASE NUMBER: 24-496 RK

# United States District Court
# District of New Jersey

UNITED STATES OF AMERICA

v.

CHAIM ELIMELECH PURETZ,
a/k/a "ELI PURETZ"

## INFORMATION FOR

18 USC § 371

PHILIP R. SELLINGER
UNITED STATES ATTORNEY
FOR THE DISTRICT OF NEW JERSEY

SIJI MOORE
TRIAL ATTORNEY
FRAUD SECTION
MARTHA K. NYE
ASSISTANT U.S. ATTORNEY
TRENTON, NEW JERSEY
609-989-0579